IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAMARA ANN MILLER, | ) | CASE NO. 1:12CV148 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Tamara Ann Miller ("Plaintiff" or "Miller") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act"), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title

XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).  For the following reasons, the final decision of the Commissioner should be

**AFFIRMED.**

## I.  Procedural History

On November 14, 2008, Miller filed applications for SSI and DIB, alleging a disability

onset date of March 1, 2008.  Tr. 131-41.  Miller claimed that she was disabled due to a

combination of impairments, including hand and wrist problems in her dominant right hand,

depression, and anxiety.  Tr. 94, 164, 169.  Miller was notified on November 25, 2008, that she

did not meet the eligibility requirements for SSI due to unearned income.  Tr. 87-93.  Miller's

DIB application was denied initially and on reconsideration, and she thereafter requested a

hearing before an administrative law judge.  Tr. 67-68, 94-101.  Miller filed a subsequent SSI

1

application on September 21, 2009.  Tr. 142-44.  Because Miller's second SSI application
concerned the same issues raised in her November 2008 DIB application, it was escalated to the
hearing level.  On September 23, 2010, a hearing was held before Administrative Law Judge
Suzanne A. Littlefield (the "ALJ").  Tr. 10-53.  On December 17, 2010, the ALJ issued a
decision finding that Miller was not disabled.  Tr. 72-81.  Miller requested review of the ALJ's
decision by the Appeals Council on January 18, 2011.  Tr. 5-7.  On September 7, 2011, the
Appeals Council denied review, making the ALJ's decision the final decision of the
Commissioner.  Tr. 1-4.

## II.  Evidence

### A.  Background

Miller was born on July 8, 1962, and was 45 years old on the alleged disability onset
date.  Tr. 131, 173.  She attained her high school equivalency diploma (GED) in 1984.  Tr. 65,
92, 170, 173.  Miller's past work history includes work as machine tender and a machine
operator.  Tr. 65, 92, 170, 173.

### B.  Medical Evidence

#### 1.  Physical Impairments

On March 20, 2008, Miller saw Kevin J. Malone, M.D., at MetroHealth Medical Center
("MetroHealth"), for evaluation of her complaints of right wrist pain.  Tr. 308.  Miller stated that,
approximately 20 years earlier, she had fallen and sustained an extra-articular fracture of her
right distal radius.  Tr. 308.  She reported that she took Vicodin to relieve the pain.  Tr. 308.  Dr.
Malone noted mild swelling and deformity of the wrist.  Tr. 309.  Consistent with x-ray results
(Tr. 324), Dr. Malone concluded that Miller had a malunited fracture of her distal radius with

resultant degenerative changes.[1]  Tr. 309, 635.  He ordered a wrist CT scan, renewed a prescription for Vicodin, gave her a prescription for Naprosyn, and recommended that she continue using her wrist splint for support.  Tr. 309.

Miller saw Dr. Malone for a follow-up appointment on April 17, 2008.  Tr. 304.  On examination, Dr. Malone noted that Miller had full range of motion of her fingers, that she was able to make a full tight fist, that her fingers were warm, and that her sensation was intact.  Tr. 304.  A CT scan of Miller's right wrist showed a malunited fracture of her distal radius and degenerative changes of the radiocarpal and midcarpal joints.  Tr. 304, 322.  Dr. Malone diagnosed a malunion of right distal radius fracture with posttraumatic arthritis of the wrist and closed Colles' fracture. Tr. 304-05.  He stated that he did not think corrective osteotomy of the radius would provide Miller with any predictable relief and that she was not a candidate for wrist arthroplasty given her age and activity level.  Tr. 304.  Dr. Malone suggested that Miller could undergo a total wrist effusor or get injections, but she declined both.  Tr. 304.

On July 14, 2008, Miller returned to MetroHealth for a follow-up appointment regarding her right wrist and saw Joy B. Sharma, M.D.  Tr. 293.  Miller complained of persistent discomfort and pain.  Tr. 293.  Dr. Sharma noted that Miller "has been on Naprosyn and Vicodin and has had a lot of requirements for Vicodin and comes in today mainly [for] more pain medication. She is not interested in any surgical intervention." Tr. 293.  Dr. Sharma referred Miller to a pain management specialist.  Tr. 294.

Miller saw David Ryan, M.D., a pain management specialist at MetroHealth, for a pain management assessment on July 17, 2008.  Tr. 290-91.  Dr. Ryan found that Miller had a normal neurological examination and that her motor strength, reflexes, and fine motor coordination were

---

[1]  Malunion is a clinical term used to indicate that a fracture has healed, but that it has healed in less than an optimal position.  *See* CLEVELAND CLINIC, available at http://my.clevelandclinic.org/disorders/fractures/or_mal-union.aspx.

3

also normal.  Tr. 290-91.  Dr. Ryan noted allodynia over the right wrist and hand and some swelling of the right veins.  Tr. 291.  He assessment was a malunion of a fracture, closed Colles' fracture, pain in limb, and reflex sympathetic dystrophy (RSD) of the upper limb.  Tr. 291.  Dr. Ryan noted that there was no real surgical option other than fusion, which Miller was "afraid to consider."  Tr. 290.

On August 18, 2008, Miller saw Brendan Astley, M.D., at MetroHealth for evaluation of her reflex sympathetic dystrophy and right wrist pain.  Tr. 281.  She described her pain as dull, burning, and continuous.  Tr. 281.  Miller reported having a "gradually improving course," and noted that a prior stellate ganglion block provided some relief.  Tr. 281.  Miller had additional blocks in August and in October 2008.  Tr. 282, 509-11.

At an appointment with Dr. Ryan on November 12, 2008, Miller reported that the ganglion blocks produced good results that lasted for about 1.5 weeks each.  Tr. 276-77.  She also reported that her pain was a "9" on a scale of 1-10, but this was "unusually high."  Tr. 276.  Dr. Ryan noted that "I think Tamara is a reasonable patient who is very functional even though she has a chronic pain issue."  Tr. 276.  He continued Miller's medication regimen and indicated that he would reserve further ganglion blocks for "exacerbations."  Tr. 277.

On February 3, 2009, Miller saw Noreen C. Griffin, CNP, at MetroHealth.  Tr. 358-59.  Miller complained to Ms. Griffin about having pain in her right arm and wrist but she admitted that it was the result of moving furniture in her mother's house.  Tr. 358.  Ms. Griffin continued Plaintiff on her medication regimen.  Tr. 358.

Miller saw Stephanie Casey, M.D., at MetroHealth on June 8, 2009.  Tr. 568-69.  Dr. Casey noted that Miller had limited range of motion in the right wrist, but normal strength bilaterally and that x-rays showed "good healing."  Tr. 568.  She referred Miller to the physical

medicine and rehabilitations clinic at MetroHealth.  Tr. 569.

On September 9, 2009, Miller saw Meredith Konya, M.D., a physical medicine and rehabilitation specialist at MetroHealth.  Tr. 644-47.  Miller stated that she was not interested in pursuing a surgical fusion of the wrist.  Tr. 645.  Dr. Konya noted that Miller's pain was managed with medication and she had experienced some relief from stellate ganglion blocks.  Tr. 645.  Miller's pain was a 6/10, but she had no numbness, tingling, hypersensitivity or color change.  Tr. 645.  On examination, Dr. Konya noted that Miller's right wrist strength and sensation were intact and her fine motor skills were only slightly impaired due to a decreased range of motion.  Tr. 647.  Miller told Dr. Konya that she had not worked since February 2008, but was trying to find a job.  Tr. 646.  Miller also denied having anxiety or depression.  Tr. 646.  Dr. Konya recommended that Miller consider additional injections if the joint flared up.  Tr. 647.  On September 15, 2009, Miller declined to have localized injections, and admitted that her pain was controlled with medication.  Tr. 654.

Miller saw Dr. Ryan on August 5, 2010 for a renewal of her medication.  Dr. Ryan reported that a urinary drug screen was positive for alcohol (ETOH) and negative for opioids.  Tr. 702.  Because of the drug test results, Miller was given only a one-time medication refill and advised to find another provider for her pain management.  Tr. 701. Dr. Ryan also advised Miller to seek rehabilitation services and wean herself off the Vicodin.  Tr. 702.

### 2. Mental Impairments

Miller was treated by psychiatric clinical nurse specialist Rebecca Snider, RN, between 2008 and 2010.  During that period, Ms. Snider frequently noted that Miller was well-groomed, cooperative, fully oriented, with normal speech and a logical thought process; that her recent and remote memory were within normal limits; that her judgment and insight were good; that she

showed no evidence of suicidal or homicidal ideations, delusions or paranoia; and that her

cognitive functioning was sufficient.  Tr. 274, 279, 283, 299-300, 306, 311, 317-18, 352, 404,

406, 408, 415, 606.  In addition, Ms. Snider typically found that Miller's mood was "good" and

"calm," and her concentration and attention were described as "improving," "okay," "better,"

"good," or "sustained.  Tr. 274, 279, 283, 317-18, 404, 408, 415, 606.  Also during that period,

Miller repeatedly denied having any side effects from medication.  Tr. 274, 279, 283, 299, 306,

311, 318, 352, 356, 360, 404, 406, 408, 415, 596, 606.

At an appointment with Ms. Snider on February 15, 2008, Miller complained of feeling

more anxiety.  Tr. 311-12.  She stated that her son's diabetes was "out of control," that she was

not getting along with her boyfriend, that her mother was sick, and that her siblings were

experiencing alcohol-related issues.  Tr. 311.  Ms. Snider assessed increased anxiety with

increased stress.  Tr. 312.  However, at an appointment on April 14, 2008, Miller stated that she

was "doing a lot better."  Tr. 306-07.  She stated that her relationship with her brother had

improved and that she was better able to manage her son's health.  Tr. 306.  Ms. Snider found

that Miller had decreased anxiety with improved boundaries and assessed a global assessment of

functioning ("GAF") score of 70-75.[2]  Tr. 307.

On June 3, 2008, Miller complained of increased stress related to the health of her

boyfriend and son, as well as her relationships with her sister and mother.  Tr. 299-300.  Ms.

Snider noted that Miller's concentration was "not too good because she is tired."  Tr. 453.  Ms.

---

[2] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*  A GAF score between 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  *Id.*

Snider assessed a GAF score of 70.  Tr. 299-300.  At an appointment on August 2008, Miller told Ms. Snider that she was "doing well."  Tr. 283-84.  She also informed Ms. Snider that she had enrolled at Cuyahoga Community College for the LPN program, and that she was looking forward to going to college.  Tr. 283.  Ms. Snider assessed a GAF score of 75.  Tr. 284.

On September 26, 2008, Ms. Snider described Miller as being "stable."  Tr. 279-80.  Miller reported that she was doing well and enjoying her classes to become an LPN.  Tr. 279.  Miller also reported wrist pain that was a "5" on a scale of 1-10.  Tr. 279.  Ms. Snider assessed a GAF score of 75-80.   At an appointment on November 13, 2008, Miller indicated that, although she experienced some stress and anxiety related to her son's diabetes treatment, she was "doing okay."  Tr. 274.  Ms. Snider assessed a GAF score of 75-80.  Tr. 275.

Miller saw Ms. Snider on January 30, 2009 and reported that her mother had died.  Tr. 360-61.  She stated that she was still grieving for her mother and trying to deal with a dysfunctional family.  Tr. 360.  Ms. Snider found that Miller had high anxiety and that Miller had "a year where she was doing well and then had several setbacks," including the loss of her mother.  Tr. 530.  Ms. Snider assessed a GAF score of 65.  Tr. 361.  On February 27, 2009, Miller told Ms. Snider that she was "doing well," and that her main focus was her son.  Tr. 356-57. She was dealing with anxiety related to "the drama in her family" involving growing up in an alcoholic family and having siblings who drank.  Tr. 356.  Ms. Snider encouraged Miller to attend Al Anon meetings and keep healthy boundaries with family members.  Tr. 357. She assessed a GAF score of 60-65.  Tr. 357.

Miller had a follow-up appointment with Ms. Snider on July 20, 2009.  Tr. 408-09.  Miller stated that she was doing much better on Abilify and expressed interest in attending counseling.  Tr. 408.  Miller stated that other people had noticed that she was not arguing and

"flying off the handle" and not panicking.  Tr. 408.  Ms. Snider assessed a GAF score of 65.  Tr. 408-09.  At an appointment on October 28, 2009, Miller stated that she "needs to work," and that she had a job interview with a company where her sister worked.  Tr. 412-13.

On October 15, 2009, Miller was evaluated by Mary Colleen Fallon, a Licensed Independent Social Worker (LISW).  Tr. 656-67.  On examination, Miller was cooperative but mildly anxious, fully oriented, had a normal thought process and speech, denied suicidal thoughts or intentions, had good judgment and insight, and sustained attention span and concentration.  Tr. 660.  Ms. Fallon noted that Miller was unemployed but that she might be getting a job at a nursing home.  Tr. 662.  She diagnosed Miller with anxiety disorder, NOS, and assessed a GAF score of 60.  Tr. 661.  Ms. Fallon recommended counseling sessions with Miller every two weeks.  Tr. 661.

At a counseling session with Ms. Fallon on October 29, 2009, Miller reported that her mood was a "5" on a scale of 1-10.  Tr. 674-75.  Miller also complained of ankle pain but not wrist pain.  Tr. 674.  She stated that she "probably" got the job she had applied for and that being able to work would be good because she had too much time on her hands.  Tr. 674.  Ms. Fallon noted that Miller's memory was within normal limits and her attention span and concentration were sustained.  Tr. 675.  Ms. Fallon also noted that Miller benefitted from individual counseling.  Tr. 675.

Miller presented to Ms. Snider for a follow-up appointment on December 2009.  Tr. 415-16.  Ms. Snider noted that Miller was working part-time and was "doing well, [with] some anxiety continuous."  Tr. 415-16.  Miller stated that she found counseling "helpful."  Tr. 415.  Ms. Snider assessed a GAF score of 70.  Tr. 416.

At a counseling session on December 17, 2009, Ms. Fallon noted that Miller had not been keeping regular appointments because she obtained employment working with "mentally challenged adults and children." Tr. 703-04.  Ms. Fallon stated that Miller enjoyed her work and that "having something constructive to do with her time has helped her depression immeasurably." Tr. 703.  Miller stated that she was "in a good, peaceful mood and would like to remain there." Tr. 703.  Miller also reported that she planned to go to the office Christmas party later in the day.  Tr. 703.

Miller saw Ms. Snider on February 17, 2010 and stated that she was "doing well." Tr. 595.  Miller stated that she was working at Acacia Place and that she liked it.  Tr. 595-96.  Miller also indicated that she enjoyed taking a spinning class at a gym and was losing weight.  Tr. 595. Miller's motivation and concentration were "good," and her energy level was "high."  Tr. 595-96.  Ms. Snider assessed a GAF score of 70.  Tr. 596.  At an appointment on June 1, 2010, Miller told Ms. Snider that she was "not doing well" and feeling more depressed due to familial issues. Tr. 616-17.  Her attention and concentration were impaired and she was cooperative, though withdrawn and agitated.  Tr. 617.  Ms. Snider assessed a GAF score of 45.[3]  Tr. 617.  However, at an appointment with Ms. Snider on June 29, 2010, Miller stated that was "doing much better." Tr. 708.  Miller reported that she had "lost 15 pounds and is doing a lot," and her boyfriend noted that she was not as combative as before.  Tr. 708.  Miller also stated that she felt "much better" and was not dwelling on the past.  Tr. 708.  Although she claimed to feel "fidgety" with Ambien, her concentration, motivation, judgment, insight, mood, and energy were "good."  Tr. 708.  Ms. Snider assessed a GAF score of 70, which was up from 45 at the last visit.  Tr.  709.

---

[3] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

3.   **State Agency Physicians**

a.   **Physical Impairments**

On February 25, 2009, W. Jerry McCloud, M.D., a state agency physician, reviewed the medical records and prepared a Physical Residual Functional Capacity Assessment.  Tr. 340-47. He opined that Miller could perform medium work but that her ability to push and/or pull was limited in the upper extremities. Tr. 341. He also limited Miller to occasional climbing of ladders, ropes, or scaffolds, and occasional handling and fingering in the right upper extremity. Tr. 341-43.

b.   **Mental Impairments**

On February 3, 2009, Suzanne Castro, Psy.D., a state agency psychologist, reviewed the medical evidence and completed a Psychiatric Review Technique form.  Tr. 326-39.  Dr. Castro opined that Miller's anxiety and depression did not pose more than a minimal limitation on her functioning.  Tr. 338.  Specifically, Dr. Castro concluded that Miller had only mild restrictions in her activities of daily living, mild restrictions in maintaining social functioning, mild restrictions in maintaining concentration, persistence, or pace, and no episodes of decompensation.  Tr. 336.

On May 28, 2009, Tasneem Khan, Ed.D., reviewed the medical records and completed a Case Analysis.  Tr. 369.  He noted that Miller alleged increased problems with anxiety and social functioning but found that her allegations were only partially credible because they were not entirely supported by the medical evidence of record.  Tr. 369.  Specifically, Dr. Khan noted that Miller had a boyfriend, was planning to go to a career counselor, and was going to a Kid Rock concert.  Tr. 369.  Dr. Khan opined that no more than mild impairments are supported by Miller's activities of daily living and her medical records.  Tr. 369.  He therefore affirmed the assessment completed by Dr. Castro as written.  Tr. 369.

C.      **Administrative Hearing**

1.      **Miller's Testimony**

On September 23, 2010, Miller appeared with counsel and testified at a hearing before the ALJ.  Tr. 19-38.  Miller testified about her prior employment and stated that she worked at Apax Box for eight years making boxes.  Tr.  19-20.  Miller stated that she would have to lift approximately 25 pounds at that job and that she was constantly using her hands and arms to fold the boxes.  Tr. 31.  She also testified that she had to do fine manipulation with her fingers because she was constantly spotting the boxes and that her wrist would hurt because she was continually flipping boxes.  Tr. 31. Miller stated that she was fired from that job because she would have to leave early or would miss work because of her mental state.  Tr. 19-20.  She also explained that she would need to take unscheduled breaks to go to the bathroom and splash cold water on her face to wake up because she was drowsy from her medications.  Tr. 32.

Miller then described the impairment to her right wrist.  She stated that 20 years ago she fell and suffered a Colles fracture to her right wrist.  Tr. 21.  Miller stated that the fracture had not healed properly.  Tr. 21.  She also stated that the pain had become really bad over the last five years and that her wrist was immobile and interfered with her ability to do her daily activities.  Tr. 21-22.  Miller testified that she takes Vicodin every four hours for the pain.  Tr. 21. She stated she could lift a gallon of milk with that hand once or twice, but after that her wrist would give out.  Tr. 22.  She also stated that she used her left hand for cooking and other activities.  Tr. 23.  Miller testified that she could pick things up with her right hand, such as coins off a table.  Tr. 23.

Miller also testified about her mental impairments.  She stated that she could use help paying her bills because she was a "little bit spacey" due to her medications.  Tr. 24.  Miller also

described her mood swings, stating that she has highs and lows on a daily basis.  Tr. 26.  She

stated that she had been prescribed Wellbutrin to help with her mood and that it was working.

Tr. 27.   Miller also explained that being in large crowds made her anxious and panicky.  Tr. 28.

However, she acknowledged that she had recently gone to a Kid Rock concert.  Tr. 28.  Miller

further testified that she had racing thoughts and that her mind would be "off thinking about

something else" and not concentrating on what she should be doing.  Tr. 29.

### 2.        Vocational Expert's Testimony

Thomas Nimberger appeared at the hearing and testified as a vocational expert (the

"VE").  Tr. 38-49.  He stated that Miller had previously worked as a machine tender (an

unskilled position that was performed at the light to medium exertion levels) and a machine

operator (an unskilled position performed at the light, medium, and heavy exertion levels).  Tr.

41.  The ALJ then asked the VE whether a hypothetical individual with Miller's vocational

characteristics and the following limitations could perform any of her past relevant work:

> [L]ift 50 pounds occasionally, 25 pounds frequently, able to do occasional
> handling and fingering, and where the push/pull is limited with the right upper
> extremity but not limited at all as to the left, and only occasional ladders, ropes,
> and scaffolding, that would be where the right upper extremity is the dominant
> hand.

Tr. 42-43.  The VE testified that the hypothetical person could not perform any of Miller's past

relevant work but could perform other jobs that existed in significant numbers in the national

economy, including gate guard (710 jobs in Northeast Ohio and 210,000 jobs nationally),

security guard (690 jobs in Northeast Ohio and 193,000 jobs nationally), and counter clerk (690

jobs in Northeast Ohio and 125,000 jobs nationally).  Tr. 43-44.  The ALJ then asked the VE if

the identified jobs required constant concentration.  Tr. 45.  The VE stated that it would be

tolerable for a person to be distracted from their job for approximately 10% of the day.  Tr. 45.

Counsel for Mayo asked the VE if missing a day of work every two weeks would impact the number of identified jobs.  Tr. 47.  The VE responded that, although the whole workforce would be available to that person, sooner or later the person would be fired because missing a day of work every two weeks is beyond the normal parameters of employment.  Tr. 47.  Counsel also asked the VE if being tardy to work, sometimes as much as three hours, a few times a week would impact the number of identified jobs.  Tr. 47.  The VE stated that it would not be tolerable.  Tr. 47.  Lastly, counsel asked the VE whether having to take multiple unscheduled breaks would impact the number of available jobs.  Tr. 48.  The VE testified that short, quick breaks to use the bathroom or get a drink or water would normally be allowed.  Tr. 49.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that Miller had not engaged in substantial gainful activity since her alleged onset date of March 1, 2008.  Tr. 74.  At Step Two, she found that Miller had the following severe impairments: degenerative arthritis of the right wrist, closed Colles fracture, anxiety disorder, and depressive disorder.  Tr. 74.  At Step Three, the ALJ found that Miller did not have an impairment or combination of impairments that

14

met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[4]

Tr. 75.  The ALJ then determined Miller's RFC and found that she could perform a range of light

work with the following limitations:

> [S]he can only do occasional handling and fingering. Pushing/pulling is limited
> with the right upper extremity but not the left upper extremity.   She can only
> occasionally work on ladders, ropes or scaffolds.   She would be mentally
> districted but not away from her post approximately 10% of the day.

Tr. 76.  At Step Four, the ALJ found that Miller could not perform her past relevant work.  Tr.

80.  At Step Five, after considering her vocational factors, RFC, and the evidence from the VE,

the ALJ found that Miller was capable of performing work that existed in significant numbers in

the national economy. Tr. 80.  Thus, the ALJ concluded that Miller was not disabled.  Tr. 81.

## V.  Arguments of the Parties

Miller objects to the ALJ's decision on several grounds.[5]  She argues the ALJ erred under

Step Three of the sequential analysis in finding that Miller did not meet or equal Listing 1.07.

Miller also contends that the ALJ's RFC determination is not supported by substantial evidence

because the ALJ did not properly evaluate Miller's credibility.  Miller further argues that the ALJ

erred under Step Five because she disregarded the testimony of the VE when she concluded that

there were jobs that existed in significant numbers in the national economy that Miller could

perform.

In response, the Commissioner argues that Miller does not meet or medically equal

Listing 1.07.  The Commissioner also asserts that substantial evidence supports the ALJ's RFC

---

[4]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P,
App. 1, and describes impairments for each of the major body systems that the Social Security Administration
considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,
education, or work experience.  20 C.F.R. § 404.1525.

[5]  Miller's presentation of her arguments is confusing and disjointed.  The undersigned shall consider all of her
arguments but, for purposes of clarity, will address them in a manner more consistent with the steps of the sequential
analysis.

determination and that the ALJ properly evaluated Miller's credibility. Finally, the Commissioner argues that the ALJ properly considered the testimony of the VE and that substantial evidence supports her Step Five determination that Miller could perform other work that existed in significant numbers in the national economy.

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B. Substantial Evidence Supports the ALJ's Determination that Miller Did Not Meet Listing 1.07

Miller argues that the ALJ erred at Step Three of the sequential analysis by failing to find that her impairments met or equaled Listing 1.07. This argument is without merit.

16

In order to meet or equal a Listing, a claimant must prove that she meets all of the Listing's specified criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id*. at 530.  Listing 1.07 describes a fracture of an upper extremity and requires:

> Fracture of an upper extremity with **<u>nonunion</u>** of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.07 (emphasis added).  Under Listing 1.00M, the phrase "under continuing surgical management" refers to surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00M.

In this case, the ALJ found that Miller's impairments did not meet the requirements of Listing 1.07 because her "fracture occurred approximately 20 years ago and she has a malunion and deformity, not a nonunion."  Tr. 75.  The ALJ also found that Miller did not meet the requirements of Listing 1.07 because she still had some functional use of her arm.  Tr. 75.  On review of the record, the ALJ's Step Three determination is supported by substantial evidence.

While the evidence in this case clearly shows that Miller suffered a fracture of her right distal radius, the other criteria of Listing 1.07 are not met.  First, there is no medical evidence that Miller suffered a nonunion of the fracture as required by the Listing.  Instead, in March 2008, Dr. Malone opined that Miller had a malunited fracture of her distal radius.  Tr. 309, 635.  Similarly, in July 2008, Dr. Ryan found that Miller suffered a malunion of the fracture.  Tr. 291.  Courts have recognized that "a malunion is significantly different than a nonunion." *Rosebrough v. Astrue*, No. 08-4051, 2009 WL 634699, at *6 (D. Kan. Mar. 11, 2009) (citing *LeMaster v.*

*Sec'y of Health & Human Servs*., No. 87-74045, 1990 WL 157504, *3 (E.D. Mich. July 24, 1990)).  "A nonunion and malunion are two distinct things, the first being a failure to heal and the latter being an abnormal healing. Section 1.07 does not encompass such malunions." *Crockett v. Astrue*, No. 10-64, 2011 WL 2148815, at *9 (W.D. Va. June 1, 2011).

Second, Miller has not undergone continuing surgical management of her fracture. Miller's fracture occurred in 1988.  Approximately 20 years later, in April 2008, Dr. Malone suggested that Miller undergo a total wrist effusor, but she declined this surgery.  Tr. 304.  In addition, in July 2008 and September 2009, respectively, Drs. Sharma and Konya also noted that Miller was not interested in any type of surgical intervention.  Tr. 293, 645.  Thus, Plaintiff has not undergone continuing surgical management of her fracture, as required by Listing 1.07.

Third, as the Commissioner states in his brief, Miller had not lost functional use of her extremity, as contemplated by Listing 1.07.  The ALJ recognized that Miller still had some functional use of her arm, as evidenced by Miller's testimony that, although it was painful, she could lift a gallon of milk.  Tr. 75.  In addition, there is evidence in the record that Miller was able to perform all activities of daily living, such as taking care of herself and her son, cooking, doing light housework, driving a car, taking the garbage out, and shopping.  Tr. 186.  Further, there is evidence that Miller had a full range of motion of her right wrist, that she was able to make a full tight fist, that her sensation was intact, and that she had normal strength and fine motor coordination.  Tr. 290-91, 304, 647.

Based on the foregoing, substantial evidence supports the ALJ's conclusion that Miller did not meet all of the criteria for Listing 1.07.  Under the applicable standard of review, the ALJ's decision at Step Three should therefore be affirmed.

**C.       The ALJ's RFC Determination**

**1.       Substantial Evidence Supports the ALJ's RFC Determination**

A claimant's RFC is a measure of "the most [he] can still do despite [his] limitations."
20 C.F.R. §§ 404.1545, 416.945.  The ALJ is responsible for assessing a claimant's RFC based
on the relevant evidence.  20 C.F.R. §§ 404.1545, 404.1546(c).  In reaching an RFC
determination, the ALJ may consider both medical and non-medical evidence. *Poe v. Comm'r of
Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  It is not the Court's role to "try the case *de
novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at
387.  Thus, even if substantial evidence supports an RFC determination different than that found
by the ALJ, the Court must nevertheless affirm so long as substantial evidence also supports the
ALJ's position. *See Jones*, 336 F.3d at 477.

There is substantial evidence in the record to support the ALJ's determination that Miller
retained the RFC to perform light work subject to certain restrictions.  With regard to her
physical impairments, the ALJ imposed the following limitations in her RFC determination:
Miller could perform light work, only occasional handling and fingering, limited pushing and
pulling in the right upper extremity but not in the left upper extremity, and only occasional work
on ladders, ropes or scaffolds. The ALJ's conclusion that Miller's physical impairments required
no additional limitations is supported by substantial evidence.  In April 2008, shortly after
Miller's alleged disability onset date, Dr. Malone found that she had full motion of her fingers,
was able to make a fist, and her sensation was intact throughout.  Tr. 304.  He recommended
injections and a total wrist effusion surgery, but Miller she declined both options.  Tr. 304.  In
November 2008, Dr. Ryan noted that Miller was "very functional even though she has a chronic
pain issue."  Tr. 276.  Further, in September 2008, Miller graded her wrist pain as a "5" on a

scale of 1-10 (Tr. 279); in November 2008, Miller stated that her pain was a "9," but noted that that was "unusually high" (Tr. 276); in December 2008, Miller complained of having arm and wrist pain, but admitted that it was caused by moving furniture (Tr. 358); in September 2009, her pain was a "6," but she had no hypersensitivity, numbness, tingling, or color change (Tr. 645); and in October 2009, she complained of having ankle pain, but did not mention any wrist pain. Tr. 674.  Miller contends that she could not lift a gallon of milk or a frying pan (Tr. 22-23), but objective evidence showed that she had normal strength, sensation, and reflexes (Tr. 291, 568, 583, 647) and no numbness, tingling, hypersensitivity, or color change.  Tr. 645.  X-rays of the right hand from June 2009 also revealed "good healing."  Tr. 568.  Miller reported to the state agency that she sometimes had difficulty buttoning buttons but that she could open some jars and use zippers.  Tr. 182.  Miller also testified at the hearing that she could pick up small items like coins.  Tr. 23.  This evidence supports the ALJ's RFC determination.

The opinion of Dr. McCloud, a state agency reviewing physician, also supports the ALJ's RFC determination. [6]  Significantly, agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues.  *See* 20 C.F.R. § 416.927.  Dr. McCloud opined that Miller could perform a restricted range of medium work subject to certain restrictions due to her wrist injury.  Tr. 341.  Even though Dr. McClould opined that Miller could perform medium work, the ALJ gave Miller's testimony some weight

---

[6]  In his brief, Miller also argues that the "ALJ failed to comply with 20 C.F.R. § 404.1527 by giving 'greater weight to the opinion of the State agency medical consultants rather than Ms. Miller's treating physicians.'"  Doc. 14, p. 11.  However, Miller does not cite to any opinion from a treating physician or explain how the ALJ improperly evaluated such an opinion.  In fact, as noted by the ALJ, the record does not contain an assessment of Miller's mental capacity or physical capabilities from any treating physician.  Tr. 79.  It is therefore unclear what Miller is actually arguing because she has failed to develop this argument beyond a cursory mention of the treating physician rule.  It is well-established that "issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006); *see also Erhart v. Sec'y of Health & Human Servs.*, 989 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule because judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'").  The Court will not speculate as to what Miller's arguments might be and her treating physician argument is therefore deemed waived.

and found that she could only perform light work because her pain contributed to additional limits in her ability to lift.  Tr. 79-80.  Overall, there is substantial evidence in the record to support the ALJ's RFC determination with regard to Miller's physical impairments.

With regard to Miller's mental impairments, the ALJ imposed the following limitations in his RFC determination: she would be mentally distracted but not away from her post for approximately 10% of the day.  This determination is also supported by substantial evidence. Indeed, the medical evidence shows that Miller's mental impairments, for which she received only conservative treatment, were not as disabling as she claimed.   For instance, at mental health appointments between 2008 and 2010, Miller was routinely well-groomed, cooperative, and fully oriented; her speech was normal and she had logical thought process; her recent and remote memory were within normal limits; her judgment and insight were good; and her cognitive functioning was sufficient.  Tr. 274, 279, 283, 299, 306, 311, 317-18, 352, 404, 660, 704.  In addition, Miller's concentration and attention were described as "better," "sustained," or "good." Tr. 274, 279, 352, 404, 415, 606, 660, 675, 704, 708.  Treatment notes also show that, at various times, Miller was "stable" and "doing well," her mood was "good" and "calm," and she was "feeling much better" and "dealing with her anxiety."  Tr. 280, 283, 356, 408, 416, 595, 606, 708.  Furthermore, Ms. Snider frequently assessed GAF scores in the range of 65-80, indicating that Miller had only some transient or mild symptoms. Tr. 275, 280, 284, 299-300, 307, 361, 405, 409, 416, 596, 709.  And, at a September 2009 appointment with Dr. Konya, Miller denied having anxiety or depression.  Tr. 646.   Moreover, state agency reviewing physician Dr. Castro opined that Miller had only mild limitations in her activities of daily living, mild limitations in maintaining social functioning, and mild limitations in maintaining concentration, persistence, or pace.  Tr. 336.  The ALJ afforded Dr. Castro's opinion some weight but gave Miller the benefit

21

of the doubt and found that she had moderate, rather than mild, limitations in maintaining concentration, persistence, or pace. Tr. 75.  All of this evidence supports the limitations imposed by the ALJ with regard to Miller's mental impairments.

In sum, the ALJ reviewed the entire record, weighed the evidence, and concluded that Miller retained the ability to do light work subject to certain limitations.  This determination is supported by substantial evidence in the record.

### 2.    Substantial Evidence Supports the ALJ's Credibility Finding

Miller also contends that the ALJ erred in finding that her testimony regarding her impairments was not fully credible.  Doc. 14, pp. 10-12.  She argues that the proffered reasons given by the ALJ were insufficient to reject her testimony and subjective complaints of debilitating pain.  Contrary to this argument, the ALJ properly evaluated the entire record and reasonably concluded that Miller's subjective complaints were not fully credible.

A disability claim can be supported by a claimant's subjective complaints as long as there is objective medical evidence of the underlying medical condition in the record.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 475.  "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken."  *Id.* (citing 20 C.F.R. § 404.1529(c)(3)).  To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used.  20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.  *Rogers*, 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work.  *Id.*  The ALJ

should consider the following factors in evaluating a claimant's symptoms:

1) the individual's daily activities;
2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) factors that precipitate and aggravate the symptoms;
4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones,* 336 F.3d at 476 (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 531 (6th Cir. 1997).  It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  *Rogers*, 486 F.3d at 247.  If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state his reasons so as to make obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec*., 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *2.

In this case, the ALJ recognized that Miller had a number of serious limitations caused by her severe impairments and accounted for these limitations in the RFC determination by limiting Miller to a restricted range of light work.  Tr. 75-77.  The ALJ concluded, however, that Miller's claim that she could not perform any work whatsoever because of the severity of her symptoms was not fully credible.  Tr. 77.  In reaching this determination, the ALJ found that the objective medical evidence, the treatment Miller received, and her activities of daily living all contradicted her claims of completely disabling limitations.  Tr. 77-79.  *See* SSR 96-7p, 1996 WL 374186, at *3 (credibility analysis should include consideration of, among other things, the objective medical record, the claimant's daily activities, the effectiveness of medication, and treatment received).  The ALJ provided several reasons for discounting Miller's credibility and her analysis indicates that she considered the relevant factors under 20 C.F.R. § 404.1529(c)(3) and SSR 96-7p.  The ALJ credited Miller with pain and limitations from her medically determinable impairments but also found, based on substantial evidence in the record, that the limiting effects of those impairments were not as severe as Miller alleged and did not preclude all work.  The ALJ therefore reasonably concluded that Miller was not fully credible in alleging an incapacity for all sustained work activity.

Miller argues that the ALJ erred because she did not individually discuss each of the seven factors listed in SSR 96-7p for evaluating a claimant's symptoms.  Doc. 14, pp. 10-11.  However, the ALJ's written decision demonstrates that she considered all of the relevant evidence.  Tr. 20-22; *See Cross*, 373 F. Supp. at 732-33.  In reaching her RFC determination, the ALJ thoroughly discussed the medical records, Miller's impairments, the treatment Miller received, and Miller's statements regarding her impairments.  Tr. 77-80.  As set forth above, this evidence shows that Miller's physical and mental impairments did not preclude her from

performing all work whatsoever.  The ALJ also discussed a number of Miller's daily activities that were inconsistent with her claimed inability to perform any type of work.  For example, the ALJ noted that Miller had reported to a state agency employee that she was fanatic about neatness and had no trouble taking care of household chores.  Tr. 78.  While the ALJ could have been more precise in tying her discussion of the evidence to the seven regulatory factors set forth above, her analysis was sufficiently clear to allow a reviewing court to determine that she considered all of the relevant evidence and undertook the appropriate analysis in reaching her credibility determination.  The ALJ's analysis is therefore sufficient to sustain the credibility determination.  *See, e.g., Cross,* 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) (finding that the ALJ need not analyze all seven factors identified in the regulations).

      Miller also argues that the ALJ erred because she failed to consider the side effects of Miller's medication.  Doc. 14, p. 11.  In particular, she contends that each medication she took had its own side effects (e.g., dizziness, drowsiness, blurred vision, loss of balance and coordination, joint and muscle pain, and increased anxiety), which the ALJ did not discuss.  Doc. 14, p. 12.  First, in her RFC analysis, the ALJ thoroughly discussed the various medications that Miller was prescribed.  Tr. 76-80.  Second, Miller fails to point to any objective evidence in the record to support her claim that she experienced side effects from her medication and that the side effects interfered with her ability to work.  Contrary to this argument, on numerous occasions, Miller denied having any side effects from her medication.  Tr. 274, 279, 283, 299, 306, 311, 318, 352, 356, 360, 404, 406, 408, 415, 596, 606.  In June 2010, she claimed to be "fidgety" on Ambien, but Ms. Snider nevertheless noted that Miller had a "significant improvement in her mood," was "doing more, is less anxious and irritable and is working now." Tr. 708-09.  The ALJ's discussion of the medications that Miller took demonstrates that she

adequately considered the side effects from Miller's medications and reasonably accounted for any such side effect in her RFC determination.

In light of the evidence considered by the ALJ, the inconsistencies between Miller's statements and testimony and other evidence of record, and the deference due to the ALJ in making credibility determinations, the ALJ's credibility finding is supported by substantial evidence and should be affirmed.

**D.  Substantial Evidence Supports the ALJ's Step Five Determination**

At Step Five of the sequential analysis, the ALJ must determine whether, in light of the claimant's RFC, age, education, and past work experience, the claimant can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4).  The burden shifts to the Commissioner at Step Five to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform.  *See, e.g., Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999).  In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments.  *Ealy v. Comm'r of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010).  However, it is well settled that hypothetical questions need only incorporate those limitations that the ALJ has accepted as credible.  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Infantado v. Astrue*, 263 Fed. App'x. 469, 477 (6th Cir. 2008).

In this case, the ALJ asked the VE a hypothetical that incorporated the RFC she found for Miller.  As set forth above, substantial evidence supports the ALJ's RFC determination and, as a result, the hypothetical was appropriate in this case.  In response to the hypothetical, the VE testified that such an individual could perform unskilled work as a gate guard, security guard,

26

and a counter clerk.  Tr. 44.  The ALJ was not required to include limitations in the hypothetical that she determined to be unsupported by the evidence or not credible.  *See Casey*, 987 F.2d at 1235.  Therefore, the ALJ did not err, and the VE's testimony -- given in response to a hypothetical that reasonably reflected all the limitations that the ALJ found valid and credible -- constituted substantial evidence capable of supporting the Step Five finding.  *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).  The ALJ thus reasonably found Miller not disabled at Step Five.

Notwithstanding the foregoing, Miller contends that the representative occupations of security guard and gate guard should be eliminated based on the VE's testimony that the individual would not be hired for such positions because she would not be able to pass a drug screening test.  Doc. 14, pp. 11-12.  This argument is without merit.  To determine whether a claimant can make an adjustment to other work that exists in the national economy, the regulations provide that:

(a)     General.  We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether --
   (1)     Work exists in the immediate area in which you live;
   (2)     A specific job vacancy exists for you; or
   (3)     **You would be hired if you applied for work**.

* * *

(c)     Inability to obtain work. We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of--
   (1) **Your inability to get work**;
   (2) Lack of work in your local area;
   (3) **The hiring practices of employers**;
   (4) Technological changes in the industry in which you have worked;
   (5) Cyclical economic conditions;
   (6) No job openings for you;
   (7) **You would not actually be hired to do work you could otherwise do**; or

27

(8) You do not wish to do a particular type of work.

20 C.F.R. §§ 404.1566, 416.966 (emphasis added). As such, whether or not Miller would have actually been hired for a job is not pertinent to the issue of whether she is disabled under the Act or the regulations.

Moreover, the regulations provide that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having the requirements which you are able to meet with your physical or mental abilities and vocational qualifications." C.F.R. §§ 404.1566(b), 416.966(b). Thus, even if the security and gate guard occupations are eliminated, a single occupation – that of counter clerk – may constitute a sufficient occupational base to permit a claimant to make a work adjustment. *Id.* The VE testified that, for the job of counter clerk, there were 690 jobs in the local economy and 125,000 in the national economy. Tr. 44. Although there is no bright-line rule as to what constitutes a "significant number of jobs," *see Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988), the figures identified by the VE represent a significant number of jobs in this case.[7] The VE's testimony as to the availability of representative occupations is consistent with the regulations and accommodates Miller's RFC. Accordingly, substantial evidence supports the ALJ's Step Five determination that Miller could perform other work that existed in significant numbers in the national economy and this determination should be affirmed.

---

[7] *See e.g., Craigie v. Bowen,* 835 F.2d 56, 58 (3rd Cir. 1987) (200 jobs in region was a significant number of jobs); *Allen v. Bowen,* 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs in region, 1,600 in state, and 80,000 nationally was significant number); *McCallister v. Barnhart,* 2004 WL 1918724, *5 (D. Me. Aug. 26, 2004) (372 jobs in Maine and 50,955 nationally was significant number); *Philpott v. Astrue,* 2011 WL 6210634, at *9 (W.D. Wash. Nov. 18, 2011) (finding that 1,187 diet clerk jobs in the state and 56,304 nationally was a significant number of jobs); *Bull v. Comm'r of Soc. Sec.,* 2009 WL 799966, at *4, 6 (N.D.N.Y. Mar. 25, 2009) (finding that 125 jobs in the local economy and 100,000 jobs in the national economy constituted a significant number of jobs).

## VII. Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff

Tamara Ann Miller's applications for DIB and SSI should be **AFFIRMED**.


Dated: November 26, 2012

Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).